UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

INTERNATIONAL INDUSTRIAL
CONTRACTING CORPORATION,

       Plaintiff,

                                     Case No. 16-cv-13168

v.

                                     HON. MARK A. GOLDSMITH

SOFIR ITALIA S.R.L., et al.,

       Defendants.

_____/

**OPINION & ORDER**
**GRANTING, IN PART, AND DENYING, IN PART, DEFENDANTS' MOTION FOR**
**PARTIAL DISMISSAL (Dkt. 18), AND DENYING DEFENDANT VERGANI'S MOTION**
**TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT (Dkt. 23)**

      This matter is before the Court on a motion for partial dismissal filed by Defendants Sofir

Italia s.r.l., Alvaro Fregolent, and Marco Vergani (collectively, the "Defendants") (Dkt. 18), as

well as Vergani's separate motion to dismiss or, in the alternative, for summary judgment (Dkt.

23). The issues have been fully briefed, and a hearing was held on August 3, 2017. For the

reasons stated below, Defendants' motion is granted, in part, and denied, in part, and Vergani's

motion is denied.

## I. BACKGROUND

      In late 2013, Komatsu Ltd., a Japanese manufacturing company, was seeking an

American contractor to install its presses in two Chrysler Group LLC plants located in Michigan.

Am. Compl. ¶ 8 (Dkt. 16). Komatsu contacted Plaintiff International Industrial Contracting

Corporation ("IICC") and issued an invitation to quote the project, "which included drawings,

specifications and 'other design information' necessary to prepare a quotation for the installation

of the Komatsu presses in the Chrysler plants." Id. ¶¶ 8-9. This "other design information"

1

included a table that indicated "the types and quantities of cables that would have to be pulled and connected in connection with the installation . . . ." Id. ¶ 10.

In response to Komatsu's invitation, IICC submitted a quotation, to which Komatsu responded via email and provided more detailed information about the presses. Id. ¶¶ 12-13. IICC then revised its quote several times between November 2013 and June 2014. Id. ¶ 14.

On June 27, 2014, Sofir informed IICC that it was the "supplier" of the Komatsu presses for the project and sent IICC a Request for Quotation ("RFQ") for installation services. Id. ¶ 18.[1] Attached to the RFQ was a "Technical Specification," which stated that it "update[d] and replace[d] completely any previous specification used for preliminary quotation." Id. ¶ 19. Although the Technical Specification still "referenced several drawings of the Komatsu presses and other documents that were identical to those that had been previously provided to IICC by Komatsu," neither the RFQ nor the Technical Specification "included any electrical design drawings or specifications or any tables indicating the types and numbers of cable that would have to be installed on the Project." Id. ¶¶ 20-21.

Based on the information provided by Komatsu, as well as Sofir's RFQ, IICC submitted a quotation on July 14, 2014. Id. ¶ 24. Although the quotation was addressed to Komatsu, it was intended for Sofir. Id. Sofir responded by informing IICC that the quotation needed to be submitted to Sofir, and identifying several items that it contested and required further

---

[1] Sofir is an Italian company with its principal place of business located in Milan, Italy. Am. Compl. ¶ 2. Fregolent is an Italian citizen and the President of Sofir, while Vergani, who is also an Italian citizen, is the Chief Operating Officer. Id. ¶¶ 3-4. IICC claims that Sofir already had a business relationship with Komatsu and Chrysler, having served as a contractor of similar Komatsu presses at Chrysler plants in Italy, Brazil, and Serbia. Id. ¶ 22. Thus, according to IICC, Sofir "had knowledge of the number and sophistication of the cable connections necessary to install the Komatsu presses at issue in this action . . . ." Id. ¶ 23.

information.  Id. ¶ 25.  IICC then submitted several revised quotations to Sofir through August 2014.  Id. ¶¶ 26-27.

On October 10, 2014, IICC and Sofir entered into a contract for the installation of the Komatsu presses "in accordance to the Technical Specification."  Id. ¶ 33.  According to IICC, the parties' contract consists of five purchase orders, see id., which were attached as an exhibit to the amended complaint, see Purchase Orders, Ex. 6 to Am. Compl. (Dkt. 16-6).  At no point between June 2014 and October 2014, however, did Sofir (i) provide IICC with a basis to determine the actual number of cables and connections required for the project, (ii) determine IICC's understanding of the number of cables and connections required for the project, or (iii) inform IICC that the actual number of cables and connections required for the project exceeded the amount extrapolated from the information in a February 2014 email from Komatsu.  Am. Compl. ¶¶ 30-32.

On March 9, 2015, IICC began site preparation for the project.  Id. ¶ 35.  The first delivery of Komatsu presses arrived in Baltimore, Maryland, on March 28, and the first load from Baltimore arrived at a Chrysler plant on March 31.  Id.

IICC discovered that, as part of its scope of the work, it actually had to pull and connect more than double the number of cables.  Id. ¶ 36.  Realizing that the number of cables and connections exceeded the amount previously estimated, IICC determined the actual number of cables and connections required for the project and informed Sofir.  Id. ¶ 37.  The additional cables and connections also required the installation of cable trays that were not included in any of the specifications.  Id. ¶ 38.  Sofir thereafter approved a number of change orders, including the additional cable trays.  Id. ¶ 39.  However, despite IICC's repeated requests, Sofir has refused to pay for the installation of the additional cables.  Id. ¶ 40.  Sofir has also "refused to pay IICC

the remaining sums owed to IICC for completed work that was already agreed upon by the parties." Id. ¶ 41.

Based on the foregoing allegations, IICC has asserted the following state-law claims in its amended complaint: (i) breach of contract against Sofir; (ii) negligent misrepresentation, innocent misrepresentation, and constructive fraud against Sofir; (iii) abandonment/quantum meruit against Sofir; (iv) violation of the Michigan Building Contract Fund Act ("MBCFA"), Mich. Comp. Laws 570.151 et seq., against Sofir, Fregolent, and Vergani; and (v) both common-law and statutory conversion against Sofir, Fregolent, and Vergani.

## II. STANDARD OF DECISION

On a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), "[t]he defendant has the burden of showing that the plaintiff has failed to state a claim for relief." Directv, Inc. v. Treesh, 487 F.3d 471, 476 (6th Cir. 2007) (citing Carver v. Bunch, 946 F.2d 451, 454-455 (6th Cir. 1991)), cert. denied, 552 U.S. 1311 (2008). To survive a Rule 12(b)(6) motion, the plaintiff must allege sufficient facts to state a claim to relief above the speculative level, such that it is "plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). The plausibility standard requires courts to accept the alleged facts as true, even when their truth is doubtful, and to make all reasonable inferences in favor of the plaintiff. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Twombly, 550 U.S. at 555-556.

Evaluating a complaint's plausibility is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Iqbal, 556 U.S. at 679. Although a complaint that offers no more than "labels and conclusions," a "formulaic recitation of the elements of a cause of action," or "naked assertion[s]" devoid of "further factual enhancement" will not suffice, Iqbal, 556 U.S. at 678, it need not contain "detailed factual

allegations," <u>Twombly</u>, 550 U.S. at 555; <u>see also</u> <u>Erickson v. Pardus</u>, 551 U.S. 89, 93 (2007) ("[S]pecific facts are not necessary . . . ."). Rather, a complaint needs only enough facts to suggest that discovery may reveal evidence of illegality, even if the likelihood of finding such evidence is remote. <u>Twombly</u>, 550 U.S. at 556. Thus, a motion to dismiss "should not be granted unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." <u>Directv</u>, 487 F.3d at 476.

### III. DISCUSSION

#### A. Breach of Contract

To state a claim for breach of contract under Michigan law, IICC must first establish the existence of a valid contract, the elements of which include: "(1) parties competent to contract, (2) a proper subject matter, (3) a legal consideration, (4) mutuality of agreement, and (5) mutuality of obligation." <u>Hergenreder v. Bickford Senior Living Grp., LLC</u>, 656 F.3d 411, 417 (6th Cir. 2011) (quoting <u>Hess v. Cannon Twp.</u>, 696 N.W.2d 742, 748 (Mich. Ct. App. 2005)).[2] Once a valid contract has been established, IICC must allege the terms of the contract, that Sofir breached those terms, and that IICC suffered damages as a result of the breach. <u>In re Brown</u>, 342 F.3d 620, 628 (6th Cir. 2003); <u>Galeana Telecomms. Invs., Inc. v. Amerifone Corp.</u>, 202 F. Supp. 3d 711, 721 (E.D. Mich. 2016).

In the amended complaint, IICC alleges that it entered into a contract with Sofir to install the press lines in accordance with Sofir's specifications. Am. Compl. ¶ 33. IICC further alleges that it performed its obligations under the parties' contract, and that Sofir breached its obligations by "failing to make payments when due and by failing to provide complete, accurate

---

[2] The parties do not dispute that Michigan law controls IICC's breach-of-contract claim.

and constructible design documents." Id. ¶ 44. Sofir also "breached the implied covenant of good faith and fair dealing," which IICC claims is part of the parties' contract. Id. ¶ 45.

Defendants argue that, insofar as IICC is seeking payment for the installation of additional cables, the breach-of-contract claim should be dismissed because the contract was a "fixed-price" contract for the "turn[-]key" installation of the press lines, as opposed to a variable-cost contract. Defs. Mot. at 9, 11. According to Defendants, the contract did not "include any limitations or assumptions regarding the number of cables" required to install the press lines, and, therefore, "IICC assumed the risk that its actual costs may turn out to be higher than anticipated." Id. at 9. Defendants also argue that this claim cannot be based on IICC's purported reliance on the Komatsu table, because that table was not a part of the contract, and the terms and conditions of the purchase orders contained an integration clause, which confirmed that the purchase orders constituted the "entire agreement between the parties." Id. at 10.

In response, IICC contends that the language in the contract is ambiguous, particularly in regard to the word "turnkey." Pl. Resp. at 12 (Dkt. 21). IICC further claims that the parties' course of performance undermines Sofir's assertion that the parties had a fixed-price contract. Id. at 15. At this pleading stage, the Court agrees with IICC.

When construing contractual language, the Court must "give effect to the parties' intention at the time they entered into the contract." Beck v. Park W. Galleries, Inc., 878 N.W.2d 804, 807 (Mich. 2016) (per curiam). Such an undertaking requires the Court to examine the contract's language "according to its plain and ordinary meaning." Id.; see also Rory v. Cont'l Ins. Co., 703 N.W.2d 23, 28 (Mich. 2005) ("In ascertaining the meaning of a contract, we give the words used in the contract their plain and ordinary meaning that would be apparent to a reader of the instrument."). If the language is clear and unambiguous, the contract must be

interpreted and enforced as written.  Beck, 878 N.W.2d at 807; Reardon v. Kelly Servs., Inc., 210 F. App'x 456, 459 n.4 (6th Cir. 2006) ("[A] fundamental tenet of our jurisprudence is that unambiguous contracts are not open to judicial construction and must be enforced as written[.]" (quoting Rory, 703 N.W.2d at 30-31).

The test for ambiguity under Michigan law is whether (i) "two provisions 'irreconcilably conflict with each other,'" or (ii) a term is "'equally susceptible to more than a single meaning.'" RBS Citizens Bank, N.A. v. Purther, 22 F. Supp. 3d 747, 752 (E.D. Mich. 2014) (quoting Choates v. Bastian Bros., Inc., 741 N.W.2d 539, 543 (Mich. Ct. App. 2007)).  Whether a contract's language is ambiguous is a question of law, while the meaning of ambiguous language remains a question of fact.  Id.  Further, ambiguity may either be patent or latent.  Shay v. Aldrich, 790 N.W.2d 629, 641 (Mich. 2010).  The former appears from the face of the document and may not be identified with extrinsic evidence, while the latter "exists when the language in a contract appears to be clear and intelligible and suggests a single meaning, but other facts create the necessity for interpretation or choice among two or more possible meanings."  Id.

During the hearing, Defendants explained that the phrase "Our Specification N. 01402502 Rev. 2," which appears in the purchase orders, see, e.g., Purchase Orders at 2 (em/ecf page), was a reference to the Technical Specification in Sofir's June 27, 2014 RFQ, and acknowledged that those specifications also make up part of the parties' contract.  However, those specifications were not attached to the amended complaint, nor were the details or terms of those specifications specifically alleged.  Further, while the phrase "turn key" does appear in the purchase orders, that term is not self-explanatory based the language of the purchase orders (which includes both English and Italian).  Without further factual development regarding the precise terms of the parties' contract beyond the allegations in the complaint and the attached

purchase orders, it would be premature for the Court to rule on Defendants' arguments that the contract was for a fixed-price, thereby precluding IICC's recovery for the installation of additional cables.

This portion of Defendants' motion is denied.

**B. Constructive Fraud: Negligent and Innocent Misrepresentation**

Under Michigan law, "[c]onstructive fraud is an actual fraud without the element of intent." Talton v. BAC Home Loans Servicing LP, 839 F. Supp. 2d 896, 913 (E.D. Mich. 2012). In other words, the only meaningful "distinction between actual fraud and constructive fraud is that actual fraud is an intentional misrepresentation that a party makes to induce reliance, while constructive fraud is a misrepresentation that causes the same effect, but without a purposeful design to defraud." Id.; see also Newman v. Trott & Trott, P.C., 889 F. Supp. 2d 948, 968 (E.D. Mich. 2012) ("Constructive fraud only requires a misrepresentation which need not amount to a purposeful design to defraud."). Thus, constructive fraud is merely a term that "has been evolved to designate what is essentially nothing more than the receipt and retention of unmerited benefits." Olitkowski v. St. Casimir's Saving & Loan Ass'n, 4 N.W.2d 664, 667 (Mich. 1942). "Liability for constructive fraud may be based on negligent or even innocent misrepresentation." U.S. Fibres, Inc. v. Proctor & Schwartz, Inc., 358 F. Supp. 449, 460 (E.D. Mich. 1972); see also St. Paul Fire & Marine Ins. Co. v. CEI Fla., Inc., 864 F. Supp. 656, 666 (E.D. Mich. 1994) ("While Michigan does not have a cause of action for 'constructive fraud' per se, it does recognize the torts of innocent misrepresentation and silent fraud.").

To state a claim for negligent misrepresentation, IICC must allege facts showing that "(1) the defendant made a material misrepresentation; (2) the representation was false; (3) the defendant was negligent in making the misrepresentation, i.e., the defendant breached a business

or professional duty of care to provide accurate information to those who employ him; and (4) the plaintiff suffered damages as a result." Cleveland Indians Baseball Co., L.P. v. New Hampshire Ins. Co., 727 F.3d 633, 641 (6th Cir. 2013) (citing Law Offices of Lawrence J. Stockler P.C. v. Rose, 436 N.W.2d 70, 81 (Mich. Ct. App. 1989)).

A claim of innocent misrepresentation, on the other hand, requires IICC to allege that it "detrimentally relie[d] on a false representation in such a manner that injury inure[d] to the benefit of the party making the representation." Tocco v. Richman Greer Prof'l Ass'n, 553 F. App'x 473, 476 (6th Cir. 2013). "Privity of contract is a prerequisite to a claim of innocent misrepresentation." Id. Thus, regardless of whether IICC is pursuing negligent misrepresentation or innocent misrepresentation, it must sufficiently allege an affirmative misrepresentation by Sofir.[3]

In its amended complaint, IICC alleges that Sofir represented that the "RFQ was based upon previously supplied Komatsu design information with the sole exception of those items specifically detailed in the Technical Specification." Am. Compl. ¶ 49. According to IICC, this representation was false because Sofir was "well aware that the cable quantities previously supplied by Komatsu were massively understated." Id. ¶ 48. IICC further alleges that it relied upon Sofir's "superior knowledge of cable quantities and representation regarding cable quantities previously submitted by Komatsu when it submitted its quotation in response to Sofir's RFQ . . . ." Id. ¶ 55.

In their motion for partial dismissal, Defendants argue that, beyond the conclusory allegations above, IICC has not sufficiently alleged a misrepresentation by Sofir. See generally

---

[3] Although IICC claims to have alleged three separate theories of fraud — constructive fraud, negligent misrepresentation, and innocent misrepresentation, Pl. Resp. at 17 — the Court has explained above why there is no standalone cause of action for constructive fraud under Michigan law.

Defs. Mot. at 11-13; see also Defs. Reply at 2 (Dkt. 22) ("IICC must identify, with particularity, an objectively false statement of fact by Sofir upon which IICC reasonably relied. IICC has pleaded no such statement."). Defendants also argue that IICC did not sufficiently plead reliance. See generally Defs. Mot. at 13-17. The Court agrees.

Under the liberal pleading standard of Federal Rule of Civil Procedure 8, a pleader is required to provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2); see also Fed. R. Civ. P. 8(d)(1) ("Each allegation must be simple, concise, and direct."). However, there is a heightened pleading standard under Rule 9(b) for claims sounding in fraud, which requires that the circumstances be pled with particularity. Bennett v. MIS Corp., 607 F.3d 1076, 1100 (6th Cir. 2010); Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."). This means that IICC must "(1) specify the allegedly fraudulent statements, (2) identify the speaker, (3) state when and where the statements were made, and (4) explain what made the statements fraudulent." Newberry v. Silverman, 789 F.3d 636, 645 (6th Cir. 2015). While a federal court will examine state law to determine whether the elements of fraud have been pled sufficiently to state a cause of action in a diversity case, the Rule 9(b) requirement that the circumstances of the fraud must be stated with particularity is a federally imposed rule. See Newberry, 789 F.3d at 645; Minger v. Green, 239 F.3d 793, 800 (6th Cir. 2001).

The amended complaint does not set forth allegations of either Sofir's misrepresentation or IICC's reliance on that misrepresentation with particularity. Regarding the element of an affirmative misrepresentation, it is not clear from the amended complaint whether the alleged misrepresentation is the assertion in the RFQ itself that it updated and replaced any prior specification, or whether IICC is alleging that Sofir made some other misrepresentation

concerning the RFQ being based on previously supplied Komatsu information.  Compare Am. Compl. ¶ 49 (representing that Sofir's "RFQ was based upon previously supplied Komatsu design information with the sole exception of those items specifically detailed in the Technical Specification") with id. ¶ 19 ("The RFQ that Sofir sent to IICC in June of 2014 attached a 'Technical Specification' that declared that it 'updates and replaces completely any previous specification used for preliminary quotation.'" (emphasis omitted)).  If it is the latter, IICC's vague and conclusory assertion clearly does not meet the heightened pleading standard under Rule 9(b).  Also, while IICC alleges that Sofir made some sort of misrepresentation, IICC does not allege with particularity who at Sofir made the representation or where the representation was made.

The Court also finds IICC's allegation regarding falsity to be rather perplexing.  In the amended complaint, IICC alleges that Sofir's representation was false because "Sofir was well aware that the cable quantities previously supplied by Komatsu were massively understated." Am. Compl. ¶ 48.  However, the remaining factual allegations in the amended complaint do not allow for any reasonable inference that Sofir ever made a representation concerning the appropriate quantity of cables, or that the quantities represented by Komatsu were somehow correct.  Although IICC stated in its response that falsity turned on the fact that "neither the Technical Specifications nor the other design information provided IICC with sufficient information to accurately estimate the amount of cables and connections," see Pl. Resp. at 19-20 (Dkt. 21), IICC does not allege that Sofir ever represented that either the Technical Specifications or the other design information were sufficient to accurately estimate the number of cables required to install the press lines.

Regarding the element of reliance, IICC alleged that it relied upon Sofir's "superior knowledge of cable quantities and representation regarding cable quantities previously submitted by Komatsu when it submitted its quotation in response to Sofir's RFQ . . . ." Am. Compl. ¶ 55. Again, IICC appears to be missing an allegation to make the necessary leap for reliance. IICC must have relied upon Sofir's representation, not a representation made by Komatsu. IICC has also failed to direct the Court to any allegation in the amended complaint that Sofir made a representation about the cable quantities previously addressed in the Komatsu table.

This portion of Defendants' motion is granted and IICC's fraud-based claims are dismissed.

### C.  Abandonment/Quantum Meruit

"Michigan law recognizes that under the theory of quantum meruit, a contract may be implied at law to prevent unjust enrichment when one party inequitably receives and retains a benefit from another." KSR Int'l Co. v. Delphi Auto. Sys., LLC, 523 F. App'x 357, 363 (6th Cir. 2013). However, if there is an express contract covering the same subject matter, a contract will not be implied. Id. Importantly, the Michigan Supreme Court has recognized that this rule prohibiting recovery in quantum meruit "presupposes the existence of a valid, enforceable contract." Biagini v. Mocnik, 120 N.W.2d 827, 828 (Mich. 1963).

In its amended complaint, IICC alleges that the terms and conditions of the parties' contract did "not include any provisions for the processing of changes to the scope of work or allowing Sofir to unilaterally order IICC to perform extra work not within the scope of the [contract]." Am. Compl. ¶ 60. By performing the extra work and installing the additional cables, IICC further alleges that Sofir "accepted the benefits of IICC's [work and expenses], but has refused to fully compensate IICC fully for its services and expenses." Id. ¶ 63.

Defendants argue that "IICC's quantum meruit claim fails as a matter of law because the parties agree that there is an express contract covering the installation of the Press Lines." Defs. Mot. at 19. The Court disagrees.

Michigan law permits a plaintiff to pursue "an action in quantum meruit, even in the face of an express contract, where the performance of additional work or benefit not contemplated in the express contract is present." Lansing Bd. of Water & Light v. Deerfield Ins. Co., 183 F. Supp. 2d 979, 991 (W.D. Mich. 2002) (citing In re Dunnigan's Estate, 276 N.W. 532, 533 (Mich. 1937); Mullally v. Bey, 166 N.W.2d 500, 503 (Mich. Ct. App. 1968)); see also United Skilled Trades, Inc. v. City of Wyandotte, No. 298380, 2013 WL 1316743, at *3 (Mich. Ct. App. Apr. 2, 2013) (per curiam) (where the parties' "dispute center[ed] on whether any of the extra work billed by [the plaintiff] fell within the original scope of work delineated by the fixed bid contract and the price to be changed for the extra work performed," the court held that "the use of quantum meruit [was] the correct legal theory supporting recovery by [the plaintiff]" because it was "seeking reimbursement for work outside the fixed bid contract").

Based on IICC's allegations, it could be reasonably inferred that, despite the existence of the purchase orders, IICC performed extra work by installing additional cables above and beyond what was contemplated by the parties in their express contract. Nonetheless, because further factual development is needed to determine the precise terms of the parties' contract, ruling on whether the installation of additional cables fell within the scope of that contract would be premature.

In its amended complaint, IICC also alleges that its installation of "more than twice the number [of cables and connections it] contracted to install" was at "Sofir's direction," and demonstrates that "both parties acted in a manner consistent with an abandonment of the

contract." Am. Compl. ¶ 61. Defendants argue that there is no basis for the parties having "abandoned" the contract simply because IICC installed additional cables. Defs. Mot. at 19. Defendants further contend that IICC has not abandoned the contract because it "consistently has demanded, and continues to demand in its Amended Complaint, payments under the Contracts." Defs. Mot. at 20 (emphasis omitted). Although IICC provided no meaningful response to Sofir's arguments on this point, "[w]hether there has been an abandonment of a contract is a question of fact to be determined by the jury." Interior/Exterior Specialist Co. v. Devon Indus. Grp., LLC, 2009 WL 49616, at *6 (Mich. Ct. app. Jan. 8, 2009) (citing Dault v. Schulte, 187 N.W.2d 914, 915 (Mich. Ct. App. 1971)). Without further factual development, a ruling on whether the parties abandoned the contract is not suitable at this stage of the litigation.

This portion of Defendants' motion is denied.

### D. Michigan Building Contract Fund Act

The MBCFA, which "consists of only three relatively brief sections," was passed in 1931 "to protect the people of the state from imposition and fraud in the building construction industry and to provide penalties for the violation of th[e] act." Performance Contracting Inc. v. DynaSteel Corp., 750 F.3d 608, 611-612 (6th Cir. 2014). In general, the MBCFA "imposes a trust upon building contract funds and prohibits a contractor from retaining or using construction payments from a particular project until all laborers, subcontractors, and materialmen who worked on the project are paid." Condaire, Inc. v. Allied Piping, Inc., 286 F.3d 353, 359 (6th Cir. 2002). Thus, the contractor is the "trustee," and the "trust res is clearly defined as the monies paid by any person into the building contract fund." Huizinga v. United States, 68 F.3d 139, 144 (6th Cir. 1995).

In its amended complaint, IICC alleges that "Sofir is contractor in the building construction industry" and "engaged IICC to furnish labor and materials for improvement to the Project." Am. Compl. ¶¶ 66-67. IICC further alleges that Chrysler provided funds to Sofir for the project, but Defendants breached their fiduciary duty under the MBCFA because they "unlawfully retained and used for their own purposes an undetermined amount of [those funds]" without completely paying IICC for its "labor and materials supplied" for the installation of the press lines. Id. ¶¶ 68-71.

Much like their argument concerning IICC's breach-of-contract claim, Defendants argue that IICC's MBCFA claim should be dismissed to the extent IICC is seeking payment in excess of the parties' fixed-cost contract. Defs. Mot. at 21. According to Defendants, IICC also did not allege that any person, including Chrysler, provided funds for the installation of additional cables. Id. at 22.[4] These arguments are unconvincing for two reasons.

First, the Sixth Circuit has found that MBCFA "may apply by its own force and irrespective of a contract under certain circumstances," noting that the statute "does not require a contract for its application." Performance Contracting, 750 F.3d at 613. Thus, whether the installation of additional cables falls outside of the parties' contract does not mean that Defendants cannot also be liable under the MBCFA.

Second, as IICC correctly alludes to in its response, see Pl. Resp. at 25, the MBCFA does not require that monies placed into a building contract fund include some sort of specific designation for which those particular funds are to be used on a given construction project; however, the funds must be for that particular project. See Huizinga, 68 F.3d at 144 ("The statute imposes a duty upon the trustee to use the money in the building contract fund to first pay

_____

[4] For purposes of their motion, Defendants do not contest that the MBCFA applies in this situation. Defs. Mot. at 21 n.16.

laborers, subcontractors and materialmen <u>on the particular project for which the funds were</u> <u>deposited</u> before he uses the fund for any other purpose." (emphasis added)); Mich. Comp. Laws 570.152 (contractor violates the MBCFA if he "retain[s] or use[s] the proceeds or <u>any</u> part thereof, of <u>any</u> payment made to him, for any purpose than to first pay laborers, subcontractors and materialmen, engaged by him to perform labor or furnish material for the specific improvement . . . ." (emphasis added)).  Thus, the MBCFA prohibits a contractor from retaining or using building contract funds until all laborers, subcontractors, and materialmen have been paid for that project.  And this is precisely what IICC has pled in its amended complaint — Sofir, as the contractor, received funds from Chrysler for the particular project of installing the Press Lines, and that Defendants have retained and used those funds without fully paying IICC for its labor and materials.  These allegations are sufficient to raise a plausible claim under the MBCFA.

This portion of Defendants' motion is denied.

**E.  Common-Law and Statutory Conversion**

Under Michigan common law, conversion is defined as "any distinct act of dominion wrongfully exerted over another's personal property in denial of or inconsistent with his rights therein."  <u>Kerrigan v. ViSalus, Inc.</u>, 112 F. Supp. 3d 580, 615 (E.D. Mich. 2015) (quoting <u>Thoma</u> <u>v. Tracy Motor Sales, Inc.</u>, 104 N.W.2d 360, 362 (Mich. 1960)).  "The common law secures this right to personal property by allowing someone wrongfully deprived of his or her property to recover either that property or monetary damages, or both, for the wrongful deprivation."  <u>Aroma</u> <u>Wines & Equip., Inc. v. Columbian Distribution Servs., Inc.</u>, 871 N.W.2d 136, 142 (Mich. 2015).  "Conversion may occur when a party properly in possession of property uses it in an improper

way, for an improper purpose, or by delivering it without authorization to a third party." Nedschroef Detroit Corp. v. Bemas Enters. LLC, 106 F. Supp. 3d 874, 886 (E.D. Mich. 2015).

Statutory conversion, on the other hand, allows a person to "recover 3 times the amount of actual damages sustained, plus costs and reasonable attorney fees" if that person was "damaged as a result of . . . [a]nother person's stealing or embezzling property or converting property to the other person's own use." Mich. Comp. Laws § 600.2919a(1)(a). Essentially, statutory conversion requires the same proof as common-law conversion, "with the added element that the property must have been converted to a defendant's 'own use.'" Prime Rate Premium Fin. Corp. v. Larson, 226 F. Supp. 3d 858, 869-870 (E.D. Mich. 2016). The Michigan Supreme Court has held that conversion to the other person's "own use" requires that the injured party "show that the [other person] employed the converted property for some purpose personal to [that person's] interests, even if that purpose is not the object's ordinarily intended purpose." Aroma Wines, 871 N.W.2d at 148.

In its amended complaint, IICC alleges that it "has a right to Project Funds received by Sofir where the funds were imposed with a trust for the benefit of IICC," but that each Defendant "wrongfully and without authorization exercised dominion over the Project Funds" for their "own purposes, thereby intentionally disposing IICC of such funds." Am. Compl. ¶¶ 76, 77; see also id. ¶ 79 ("Sofir, Alvaro Fregolent and Marco Vergani disposed of the Project Funds imposed with a trust for the benefit of IICC by using such funds for their own purposes and not for the purpose of paying IICC.").

Defendants argue that "IICC cannot assert a claim for conversion based on non-payment of a monetary claim" because "[m]oney allegedly owed under a contract is not considered to be

personal property." Defs. Mot. at 22-23 (citing Llewellyn-Jones v. Metro Prop. Grp., LLC, 22 F. Supp. 3d 760, 788 (E.D. Mich. 2014)). The Court disagrees.

"Michigan law distinguishes between claims involving the alleged conversion of money and the alleged conversion of other property." Kerrigan v. ViSalus, Inc., 112 F. Supp. 3d 580, 615 (E.D. Mich. 2015). "[T]o state a claim for conversion of money, a plaintiff must allege that the defendant has an obligation to return certain specific money entrusted to his care." Id. at 616. Thus, while a conversion claim generally "cannot be brought where the property right alleged to have been converted arises entirely from the plaintiff's contractual rights," a plaintiff may maintain a conversion claim for money "so long as the defendant's conduct constituted a breach of duty separate and distinct from the breach of contract." Llewellyn-Jones, 22 F. Spp. 3d at 788

Unlike the plaintiffs in Llewellyn-Jones, who did not identify a separate duty, IICC has sufficiently alleged that Defendants had a separate and distinct fiduciary duty under the MBCFA for funds imposed with a statutory trust for the benefit of IICC. See Am. Compl. ¶¶ 68-69, 71, 77. For the time being, this allegation is sufficient to survive Defendants' motion for partial dismissal.

Defendants also argue that IICC's conversion claims are barred by the economic loss doctrine. Defs. Mot. at 23-24. Because the contract at issue in this case is one for services or a hybrid of goods and services — but not solely for goods — IICC argues that the economic loss doctrine is not applicable. Pl. Resp. at 22-23. The Court agrees with IICC.

The economic loss doctrine, which is judicially created and derived from the Uniform Commercial Code, Quest Diagnostics, Inc. v. MCI WorldCom, Inc., 656 N.W.2d 858, 861 (Mich. Ct. App. 2002), "bars all tort remedies where the suit is between an aggrieved buyer and a nonperformance seller, the injury consists of damage to the goods themselves, and the only

losses alleged are economic," <u>Sullivan Indus., Inc. v. Double Seal Glass Co., Inc.</u>, 480 N.W.2d 623, 627 (Mich. Ct. App. 1991); <u>Neibarger v. Universal Coops., Inc.</u>, 486 N.W.2d 612, 615 (Mich. 1992). Notably, the doctrine only applies to transactions involving the sale of goods. <u>Cargill, Inc. v. Boag Cold Storage Warehouse, Inc.</u>, 71 F.3d 545, 550 (6th Cir. 1995) (agreeing with the district court that the economic loss doctrine only applies in situations involving the sale of goods); <u>see also</u> <u>Citizens Ins. Co. of Am. v. Prof'l Temperature Heating & Air Conditioning Inc.</u>, No. 300524, 2012 WL 5290289, at *4 (Mich. Ct. App. Oct. 25, 2012) (per curiam) ("[T]he economic loss doctrine would not preclude an action in tort arising from a transaction in services, because these transactions are not governed by Article 2 of the UCC." (citing <u>Neibarger</u>, 486 N.W.2d at 621)). Because the contract at issue here does not involve the sale of goods, the economic loss doctrine is no barrier to IICC's conversion claims.

Nevertheless, IICC has failed to adequately allege how any of the Defendants used the funds for their "own use" to support the statutory conversion claim. Merely stating that Defendants have exercised control over or used the funds for their "own use," <u>see</u> Am. Compl. ¶¶ 79-80, without any further factual enhancement is precisely the type of formulaic recitation of an element that is insufficient to survive Rule 12(b)(6) scrutiny, <u>Iqbal</u>, 556 U.S. at 678.

Therefore, this portion of Defendants' motion is granted, in part, and IICC's statutory conversion claim is dismissed.

**F. Vergani's Motion**

In addition to arguments raised in Defendants' motion for partial dismissal, Vergani filed his own motion to dismiss or, in the alternative, for summary judgment, raising three principal arguments: (i) IICC has failed to sufficient allege that Vergani is liable under the MBCFA; (ii) under Italian law, Vergani has not exercised dominion over IICC's personal property for IICC's

claims of conversion; and (iii) Vergani cannot be held vicariously liable for Sofir's alleged wrongdoing. The Court addresses each argument in turn.

First, Vergani argues that IICC has failed to sufficiently allege facts establishing any of the elements necessary for a civil cause of action under the MBCFA. Those elements are as follows:

> (1) the defendant is a contractor or subcontractor engaged in the building construction industry, (2) a person paid the contractor or subcontractor for labor or materials provided on a construction project, (3) the defendant retained or used those funds, or any part of those funds, (4) for any purpose other than to first pay laborers, subcontractors, and materialmen, (5) who were engaged by the defendant to perform labor or furnish material for the specific project.

Performance Contracting, 750 F.3d at 614.

Regarding the first, second, and fifth elements, Vergani contends that IICC has only alleged that Sofir was the contractor, that Sofir received funds from Chrysler, and that IICC was engaged by Sofir. Vergani Mot. at 5. The Court disagrees.

The issue Vergani presents here was squarely addressed by the Sixth Circuit in In re Patel, 565 F.3d 963 (6th Cir. 2009). In that case, Empire Builders of Michigan, Inc. contracted with Shamrock Floorcovering for the construction of homes in Pittsfield Township, Michigan. Id. at 966-967. To pay its subcontractors, Empire Builders submitted subcontractors' invoices to Empire Limited Partnership, which, in turn, requested funds from its line of credit from a bank. Id. at 966. The partnership then turned those funds over to Empire Builders, which paid the subcontractors and covered other expenses. Id. Although the general contractor was Empire Builders, a corporation, the Sixth Circuit found that Sameer Patel, a corporate officer of Empire Builders, was a "contractor" under the MBCFA because any misappropriation of trust funds likely involved Patel's participation because he has the home construction project's day-to-day

administrator.  Id. at 968-969 (citing People v. Brown, 610 N.W.2d 234, 238 (Mich. Ct. App. 2000)).

Here, IICC has alleged that Vergani "is a corporate officer of Sofir who directed the collection, handling, retention and/or distribution of Project Funds . . . ."  Am. Compl. 73; see also Vergani Mot. at 8 (admitting that he "served as the Project Manager for the installation of the Press Lines").  These facts are sufficient to reasonably infer the Vergani is a plausible contractor under the MBCFA.

Regarding the third and fourth elements, Vergani argues that IICC cannot allege that he retained or used any of the trust funds because, under Italian law, he does not have authority over those funds.  Vergani Mot. at 5-6.[5]  Assuming that he does have authority, Vergani also argues that IICC's allegations are nothing more than a formulaic recitation of the elements of claim.  Id. at 6.  Again, the Court disagrees.

Although Vergani contends that, under Italian law, he lacks control over the disposition of trust funds received by Sofir because he is not an "administrator" of the company, see Vergani Mot. at 8-9, this does not mean that, as a matter of fact, Vergani did not exercise control over the trust funds as a contractor under the MBCFA.  And while the Court agrees with Vergani that IICC's allegation that Vergani "used" the trust funds for his "own purposes," Am. Compl. ¶ 71, without any further factual development is insufficient under Rule 12(b)(6), see Iqbal, 556 U.S. at 678, a contractor may also violate the MBCFA by retaining trust funds without first paying

---

[5] Even though it is outside the pleadings in this case, Vergani states that the Court may properly consider Italian law for purposes of this motion under Federal Rule of Civil Procedure 41.1. Vergani Mot. at 8 n.3.  To the extent the Court cannot consider foreign law, Vergani requests that the Court treat this motion as one for summary judgment under Rule 56, which is permitted under Rule 12(d).  Vergani Mot. at 10.  Because the Court does not rely on any of the exhibits attached to Vergani's motion in reaching its decision, Vergani's request to convert the motion to dismiss into a motion for summary judgment is denied.  Even if the Court did consider the exhibits, the Court's analysis would not be affected.

subcontractors, see Performance Contracting, 750 F.3d at 614; Condaire, 286 F.3d at 359. Aside from the facts already alleged in the amended complaint, it is hard to fathom what other facts are necessary to demonstrate that Vergani has retained the trust funds without paying IICC in violation of the MBCFA.

Second, Vergani argues that he cannot be held liable for conversion because he lacks authority to control the disposition of trust funds under Italian law. Vergani Mot. at 8. The Court has already addressed why this argument does not warrant dismissal of IICC's claims. Vergani also argues that, for purposes of the conversion claims, IICC's "generalized group pleading, without specific allegations of fact regarding Vergani's alleged involvement, is insufficient on its face to survive a motion to dismiss." Id. at 7 (citing Iqbal, 556 U.S. at 678; Hoover v. Langston Equip. Assocs., Inc., 958 F.2d 742, 745 (6th Cir. 1992)). The Court disagrees.

Unlike the plaintiffs in Hoover, who only made general averments of fraud attributed to "the defendants," which the Sixth Circuit found insufficient for Rule 9(b), 958 F.2d at 745, IICC alleges that each of the three defendants in this case converted IICC's personal property; IICC does not simply lump Defendants together in the amended complaint. See Kerrigan, 112 F. Supp. 3d at 600 (plaintiffs improperly "lump[ed] together 'the Defendants' without specifically identifying which of the Defendants engaged in the conduct alleged"). And although IICC has failed to adequately allege statutory conversion, see supra, IICC has sufficiently alleged that Vergani is liable for common-law conversion because he was a contractor and fiduciary under the MBCFA, and that his possession and retention of the trust funds has wrongfully deprived IICC of its right to those funds.

Third, Vergani argues that, because IICC has not alleged a valid claim against him directly, he also cannot be held vicariously liable for alleged wrongdoing by Sofir. Vergani Mot. at 9. It is well established under Michigan law that, without regard to the doctrine of piercing the corporate veil, corporate officers and agents are personally liable for torts that they personally commit. See Capitol Indemnity Corp. v. Interstate Agency, Inc. (In re Interstate Agency, Inc.), 760 F.2d 121, 125 (6th Cir. 1985) (applying Michigan law); see also Elezovic v. Bennett, 731 N.W.2d 452, 460 (Mich. Ct. App. 2007). This is true even if the individuals were acting on behalf of the corporation, and even if the corporation itself is liable for the torts. Id. IICC has sufficiently alleged that Vergani personally committed common-law conversion and breach of his fiduciary duty as a contractor under the MBCFA.

Accordingly, Vergani's motion is denied in its entirety.

## IV. CONCLUSION

For the reasons stated above, Defendants' motion for partial dismissal (Dkt. 18) is granted, in part, and denied, in part. Vergani's motion to dismiss (Dkt. 23) is denied. Although IICC has not filed a motion for leave to file a second amended complaint, the Court will afford IICC the opportunity to file such a motion on or before August 28, 2017. In the event IICC does not file a motion for leave, IICC's fraud-based claims and its claim for statutory conversion will be dismissed with prejudice.

SO ORDERED.

Dated: August 16, 2017                                          s/Mark A. Goldsmith
     Detroit, Michigan                                 MARK A. GOLDSMITH
                                                United States District Judge

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on August 16, 2017.

s/Karri Sandusky       

Case Manager